UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                       NO. 10-214

ALEJANDRO SOLORZANO                          SECTION "R"

## ORDER AND REASONS

Before the Court is defendant Alejandro Solorzano's motion to suppress any evidence of the firearm allegedly obtained in violation of his Fourth Amendment rights.[1]  On November 23, 2010, the Court held an evidentiary hearing.  At the hearing, the government presented the testimony of ICE agent Brian Huesman who was directly involved with the defendant's arrest and the search of defendant's residence.  Solorzano testified at the hearing, and also presented the testimony of Tiffany McKinney, the defendant's wife, and Michael D'Agostino, the leaseholder of defendant's residence.  Upon consideration of the testimony and other evidence elicited at the hearing, as well as the entirety of the record, the Court DENIES defendant's motion.

## I.    BACKGROUND

Defendant Alejandro Solorzano is indicted in a one count indictment for being an illegal alien in possession of a

---

[1]  R. Doc. 27.

firearm.[2]  Brian Huesman, an Immigration and Customs Enforcement agent, testified that ICE received an anonymous tip that Solorzano, an ICE fugitive, resided at 2413 Caswell Lane, Metairie, Louisiana, drove a white van, and possibly was armed with a shotgun.  ICE searched its database and confirmed that Solorzano was an ICE fugitive.  On July 16, 2010, ICE agents set up surveillance at the address provided by the informant.  Upon observing Solorzano exit the residence and enter a white van, ICE agents approached him, identified themselves, asked the defendant and the passenger to step out of the vehicle and arrested both the passenger and Solorzano.  The agents informed Solorzano that he was under arrest for being an ICE fugitive.  The arrest was made pursuant to an outstanding Warrant of Removal/Deportation against Solorzano.[3]  Agent Huesman testified that the van was not searched.

Solorzano was then questioned about whether he possessed travel documents.  Solorzano informed the agents that he had a passport in his bedroom.  Agent Huesman testified that at this point, the agents asked Solorzano and D'Agostino for consent to search the residence in order to retrieve Solorzano's travel documents and that both consented to the search.

---

[2]  R. Doc. 1.

[3]  R. Doc. 36-1, Ex. B.

Solorzano was cooperative, leading the ICE agents through the residence to his bedroom to obtain Solorzano's passport. Agent Huesman testified that upon entering the bedroom, the agents observed a shotgun propped against the wall.  Solorzano informed the agents that the gun belonged to him.  The ICE agents secured the weapon.  Agent Huesman testified that Solorzano then directed the officers to his dresser drawer where Solorzano's passport was found.  The agents seized the passport and the shotgun, and left the residence with the defendant in custody. According to agent Jaime Crespo's report, the agents read Solorzano his *Miranda* rights, Solorzano stated that he understood his rights and that the defendant was then transported to the field office for processing.[4]  During the processing, Solorzano gave a sworn statement that the weapon was his and that he purchased the weapon for protection.[5]  The agents then contacted the US Attorney's office which agreed to accept the Title 18 U.S.C. 922(g)(5) charge for an alien in possession of a weapon.[6]

At the hearing, Solorzano testified that at the time of his arrest, the agents told him that he was under arrest for failing to appear at his June 22, 2010 immigration hearing.  The defendant testified that the agents searched his vehicle and

---

[4]  R. Doc. 38-1 at 2.

[5]  *Id.*

[6]  *Id.*

3

discovered a shotgun shell, but neither logged the shell as evidence nor seized it.  Solorzano further testified that the agents stated that they were aware he possessed a shotgun and that they wanted to search the house to seize the shotgun to keep it from "falling into the wrong hands," but that no criminal charges would be filed.  Solorzano asserts that he directed the agents inside the residence to the closet in his bedroom where he kept the shotgun in a brown zippered case.  Solorzano further stated that he directed the officers to a blue duffel bag in his bedroom where his passport was found.

Defendant now moves to suppress the firearm recovered from his residence.  Solorzano contends that his consent to the warrantless search of his residence was invalid because the agents affirmatively misrepresented the purpose of the search by informing him that they sought to recover the firearm for safety purposes, that they were exclusively interested in his immigration case and that no criminal charges would be filed.

## II.  DISCUSSION

### A) Consent

While the proponent of a motion to suppress "normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional ... [w]here a police officer acts without a warrant, the government bears the

burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). It is well-settled that a warrantless search will be valid if it is conducted pursuant to the defendant's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The government bears the burden of proving by a preponderance of evidence that consent was voluntary. *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990).

To determine whether consent was validly given, courts consider "(1) whether the consent was voluntary, and (2) whether it was an independent act of free will." *United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008) (citing *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006)). In evaluating the voluntariness of consent, the Court looks to six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Id.* "Although all six factors are relevant, no single factor is dispositive or controlling." *United States v. Mendez*, 431 F.3d 420, 429 (5th Cir. 2005). Thus,

Courts must analyze the totality of the circumstances to determine whether the consent was knowingly and voluntarily

given.  Any misrepresentation by the government is a factor to
be considered in evaluating the circumstances.  The issue to
be decided is whether, looking at all of the circumstances,
the defendant's will was overborne.

*United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985).

Solorzano does not dispute that his initial arrest was
justified.  On June 22, 2010, Immigration Judge Wayne Stogner
issued an order that the defendant be removed from the United
States.[7]  Further, Solorzano's arrest was made pursuant to an
outstanding Warrant of Removal/Deportation.[8]  Defendant contends,
however, that his consent to the search of his residence was
invalid because the agents misrepresented the purpose of the
search.  For the reasons discussed below, the Court finds that
Solorzano was not a credible witness, that the agent's version of
events was more believable and that Solorzano's consent to the
search was voluntary.

At the outset, the Court finds that defendant's custodial
status weighs against a finding of voluntariness.  The evidence
shows that at the time the agents asked Solorzano for consent to
search his house, he was handcuffed and in the custody of the ICE
agents.  The Court notes, however, that "the fact of custody
alone has never been enough in itself to demonstrate a coerced

_____

[7]  R. Doc. 36-1, Ex. A.

[8]  R. Doc. 36-1, Ex. B.

6

confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976).

Several of the other factors, on the other hand, support a finding of voluntariness.  First, the evidence shows that Solorzano was cooperative with the agents.  Both Solorzano and Agent Huesman testified that Solorzano was cooperative throughout the entire encounter.  Specifically, Huesman testified that Solorzano directed the agents to the dresser in his bedroom where his passport was found.  Further, in his brief, defendant acknowledges that after being "arrested without incident,"[9] he led the agents through his apartment and directed them to his bedroom.  In addition, there is no evidence that Solorzano was hesitant in answering the agents' questions or in otherwise cooperating with them.  Second, there is no evidence that the agents used intimidation or threats of force to obtain Solorzano's consent.  Third, the evidence also shows that in consenting to the search of his home, the defendant believed no incriminating evidence would be found. The defendant testified that he thought it was legal for him to have a gun and that he told the ICE agents that he thought he could possess a weapon if it was not loaded.  Thus, the evidence supports a finding that the defendant believed possession of the firearm was not incriminating evidence.

---

[9]  R. Doc. 27 at 1.

Solorzano's primary argument in support of his assertion of involuntary consent is that the agents affirmatively misrepresented the purpose of their search.  While "[c]onsent induced by an officer's misrepresentation is ineffective," *Cavitt*, 550 F.3d at 439 (citing *United States v. Webster*, 750 F.2d 307, 322 (5th Cir. 1984)) (internal quotations omitted), "[t]he mere failure ... to give an encyclopedic catalogue of everything [the officers] might be interested in does not alone render the consent to search involuntary."  *Davis*, 749 F.2d at 295; *see also United States v. Andrews*, 746 F.2d 247, 250 n.3 (5th Cir. 1984), *overruled on other grounds by United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990) ("[The] mere failure to state a purpose does not render defendant's consent involuntary.").  Further, "[t]he mere failure to warn an individual that an investigation might result in criminal charges does not constitute fraud, deceit or trickery."  *Davis*, 749 F.2d at 296; *see also United States v. Reed*, 8 F.3d 20, 1993 WL 455542, at *4 (5th Cir. 1993) ("[The officers] clearly had no legal duty to inform [the defendant] that firearms seized in the course of their murder investigation could be used to indict him for another crime."); *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977) ("We conclude that the mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by

8

the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit or trickery.").  "Before this court will find trickery or deceit ... there must be acts by the agents which materially misrepresent the nature of the inquiry, the record must disclose some affirmative misrepresentation." *United States v. Dawson*, 486 F.2d 1326, 1329 (5th Cir. 1973).

Agent Huesman testified that Solorzano gave consent for the officers to enter his residence to obtain his passport and that the shotgun subsequently seized was in plain view during the search.  Agent Huesman's testimony and version of events was more credible than Solorzano's.[10]  Agent Huesman testified consistently that the agents sought the defendant's consent to enter the residence to obtain his passport.  His testimony was corroborated by the testimony of Solorzano's landlord, Michael D'Agostino.[11]  D'Agostino stated numerous times during the hearing that upon entering the residence, the ICE agents informed him that Solorzano and the other individual had been arrested and

_____

[10]  The Court notes that Agent Huesman and Solorzano provided conflicting testimony as to whether the ICE agents searched Solorzano's van. The Court notes that even if it believed Solorzano's testimony on this point, it would still find his testimony regarding the search of his bedroom not credible, especially in light of D'Agostino's testimony corroborating Huesman's assertion that the purpose of the search was to obtain Solorzano's travel documents.

[11]  Agent Huesman's testimony is also consistent with agent Jaime Crespo's report.

9

that "they needed their documents."  D'Agostino testified that
the agents did not mention anything about a shotgun upon entering
the residence and that to the best of his knowledge, the purpose
of Solorzano's and the agents' entering the residence was to
obtain documents.

    In comparison, defendant's testimony throughout the hearing
was both contradictory and unbelievable.  First, in his motion to
suppress, defendant states that his shotgun was kept in a "box"
in his closet.[12]  At the evidentiary hearing, however, Solorzano
testified that the gun was kept in his closet in a zippered case
made of fabric.  Solorzano specifically stated that the gun was
never kept in a box.  Second, Solorzano initially testified that
at the time of his arrest, his international driver's license was
located in his bag.  Solorzano later testified, however, that at
the time of his arrest, his international driver's license was in
his pocket.  Third, defendant testified that he kept the gun for
protection.  The Court does not find it credible that a gun kept
for protection would be kept in a zippered case in a closet.
Rather, the Court finds that it is more believable that Solorzano
kept the gun in the open where he could easily reach it without
having to remove it from a case in the closet.  Because the Court
does not find Solorzano credible and because Agent Huesman's
testimony was supported by the testimony of D'Agostino, the Court

---

    [12]  R. Doc. 27 at 2.

rejects Solorzano's contention that his consent to the search of his room was involuntary because the agents misrepresented the purpose of obtaining his consent.

The ICE agents had no obligation to warn Solorzano that criminal charges could result if he was found in possession of a firearm.  Solorzano's consent to the search was more likely the result of his erroneous belief that his possession of an unloaded firearm was lawful than from any police deception.  Accordingly, upon consideration of all of the voluntariness factors and the entirety of the record, the Court finds that the agents' warantless search of defendant's home was made pursuant to the defendant's voluntary consent.

### B) Plain View

Under the plain view exception to warrantless seizures, police may seize items where (1) the police lawfully enter the area where the item is located, (2) the item is in plain view, (3) the incriminating nature of the item is immediately apparent, and (4) the police have a lawful right of access to the item. *Horton v. California*, 496 U.S. 128, 136-37 (1990).  The agents both lawfully entered the area where the item was seized and had a lawful right of access because, as discussed above, the search was conducted pursuant to the defendant's voluntary consent.  *See United States v. Solis*, 299 F.3d 420, 438 (5th Cir. 2002)

(finding no Fourth Amendment violation where defendant consented to search of the room where heroin was found in plain view).  In addition, because the agents were aware of defendant's status as an illegal alien, the incriminating nature of the firearm was immediately apparent.  Thus, the only fact in issue is whether the defendant's shotgun was observed in plain view.

Agent Huesman testified that when the agents entered Solorzano's bedroom, they saw a shotgun, unsheathed and leaning against the wall in plain view.  The gun was a riot shotgun.  The Court rejects as not credible the defendant's testimony that the shotgun was located in his closet.  First, the Court again notes that at the suppression hearing, the defendant provided testimony inconsistent with the facts asserted in his own brief.  Solorzano states in his motion to suppress that the shotgun was kept in a box in the closet, but at the suppression hearing the defendant expressly acknowledged that the gun was never kept in a box, but was in a zippered bag.  Second, defendant testified that the agents seized only the gun and not the zippered case.  Solorzano stated that the case was still in his bedroom. Although the Court acknowledges that the government carries the burden of proving that a warrantless search or seizure is valid, the Court notes that Solorzano did not produce the case as evidence at the hearing.  The Court finds it difficult to believe that had the gun been housed in a case as the defendant asserts, the agents

12

would not have seized both the gun and the case and logged the case as evidence.  Further, the Court notes that Solorzano called a witness who lived at the same residence and who could have easily brought the case to the hearing if it was still located in the closet of his bedroom as he claimed.  Finally, defendant testified that the purpose of his having the gun was for protection.  The Court finds it more likely that a gun kept for protection would be kept unsheathed in the open where it was readily accessible, rather than in a zippered case in a closet. Accordingly, the evidence presented at the suppression hearing and the entirety of the record support a finding that the defendant's gun was observed by the ICE agents in plain view upon entering the defendant's bedroom.

Therefore, because Solorzano voluntarily consented to the search of his bedroom and the firearm subsequently seized was in plain view, the Court finds that neither the search of Solorzano's residence nor the seizure of the firearm violated defendant's constitutional rights.

13

## III. CONCLUSION

For the foregoing reasons, the Court DENIES the defendant's motion to suppress.


New Orleans, Louisiana this __1st__ day of December, 2010.


*Sarah Vance*
_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE